UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GREGORY B.[1], | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-05011-DLP-SEB |
| | ) | |
| ANDREW M. SAUL, Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Gregory B. requests judicial review of the denial by the

Commissioner of the Social Security Administration ("Commissioner") of his

application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). For the reasons set forth below,

this Court hereby **REVERSES** the ALJ's decision denying the Plaintiff benefits and

**REMANDS** this matter for further consideration.

## I.   PROCEDURAL HISTORY

On May 24, 2016, Gregory protectively filed his application for Title XVI SSI

benefits. (Dkt. 8-2 at 16, R. 15; Dkt. 8-5 at 2, R. 147). Gregory alleged disability

resulting from nerve damage, back issues, immune system issues, chronic pain, and

asthma. (Dkt. 8-6 at 6, R. 162). The Social Security Administration ("SSA") denied

---

[1] In an effort to protect the privacy interests of claimants for Social Security benefits, the Southern District of Indiana has adopted the recommendations put forth by the Court Administration and Case Management Committee of the Administrative Office of the United States Courts regarding the practice of using only the first name and last initial of any non-government parties in Social Security opinions. The Undersigned has elected to implement that practice in this Order.

Gregory's claim initially on July 25, 2016, (Dkt. 8-4 at 2, R. 80), and on reconsideration on October 4, 2016. (Id. at 9, R. 87). On November 11, 2016, Gregory filed a written request for a hearing, which was granted. (Id. at 12, R. 90).

On June 6, 2018, Administrative Law Judge ("ALJ") Teresa Kroenecke conducted a hearing, where Gregory and vocational expert Constance Brown appeared in person. (Dkt. 8-2 at 31, R. 30). On October 18, 2018, ALJ Kroenecke issued an unfavorable decision finding that Gregory was not disabled. (Dkt. 8-2 at 13-24, R. 12-23). On December 20, 2018, Gregory appealed the ALJ's decision. (Dkt. 8-4 at 65-68, R. 143-46). On October 21, 2019, the Appeals Council denied Gregory's request for review, making the ALJ's decision final. (Dkt. 8-2 at 2, R. 1). Gregory now seeks judicial review of the ALJ's decision denying benefits pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.   STANDARD OF REVIEW

To qualify for disability, a claimant must be disabled within the meaning of the Social Security Act. To prove disability, a claimant must show he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To meet this definition, a claimant's impairments must be of such severity that he is not able to perform the work he previously engaged in and, based on his age, education, and work experience, he cannot engage in any other kind of substantial gainful work that exists in significant numbers in

the national economy. 42 U.S.C. § 423(d)(2)(A). The SSA has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 416.920(a)[2]. The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted). An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352. If a claimant satisfies steps one and two, but not three, then he must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995); *see also* 20 C.F.R. § 416.920. (A negative answer at any point, other than steps three and five, terminates the inquiry and leads to a determination that the claimant is not disabled.).

---

[2] The Code of Federal Regulations contains separate, parallel sections pertaining to disability benefits under the different titles of the Social Security Act, such as the one cited here that is applicable to disability insurance benefits. Often, as is the case here, the parallel section pertaining to the other type of benefits—in this case SSI—is verbatim and makes no substantive legal distinction based on the benefit type. *See* 20 C.F.R. § 404.920(a).

After step three, but before step four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). The RFC is an assessment of what a claimant can do despite his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004). In making this assessment, the ALJ must consider all the relevant evidence in the record. *Id.* at 1001. The ALJ uses the RFC at step four to determine whether the claimant can perform his own past relevant work and if not, at step five to determine whether the claimant can perform other work in the national economy. *See* 20 C.F.R. § 416.920(a)(4)(iv)-(v).

The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id.* The Commissioner must then establish that the claimant – in light of his age, education, job experience, and residual functional capacity to work – is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.920(f).

Judicial review of the Commissioner's denial of benefits is to determine whether it was supported by substantial evidence or is the result of an error of law. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). This review is limited to determining whether the ALJ's decision adequately discusses the issues and is based on substantial evidence. Substantial evidence "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is not whether Gregory is disabled, but, rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

Under this administrative law substantial evidence standard, the Court reviews the ALJ's decision to determine if there is a logical and accurate bridge between the evidence and the conclusion. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). In this substantial evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Nevertheless, the Court must conduct a critical review of the evidence before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, she must build an "accurate and logical bridge from the evidence to [her] conclusion," *Clifford*, 227 F.3d at 872, articulating a minimal, but legitimate, justification for the decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004).

The ALJ need not address every piece of evidence in her decision, but she cannot ignore a line of evidence that undermines the conclusions she made, and she must trace the path of her reasoning and connect the evidence to her findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford*, 227 F.3d at 872.

## III.   BACKGROUND

### A.  Gregory's Relevant Medical History

On March 3, 2009, a consulting neurologist explained that Gregory, then 17 years old, had fallen off a porch in November 2008. (Dkt. 8-17 at 23, R. 595). Gregory injured his knee and had a nerve block done for a presumed diagnosis of complex regional pain syndrome, but the knee pain persisted. (Id.). He then developed a headache and low grade fever, for which an exploratory spinal/lumbar puncture was performed. (Id.). The spinal puncture was normal, but Gregory complained of persistent pain at the site of the puncture; an MRI was taken of his lumbar spine, which showed that he had a mild broad-based disc bulge and displacement of the right L5 dorsal root ganglion. (Id.). The neurologist noted that Gregory had not returned to school because of persistent pain, headaches, and knee issues. (Id.). An examination had been normal. (Id.). The provider believed that Gregory's headache pain was likely coming from his neck, recommended physical therapy for cervical spasms, and advised against any further lumbar injections. (Id. at 23-24, R. 595-96).

In June 2009, various records summarize an extensive workup with multiple healthcare providers and specialties—including pediatrics, neurology, immunology, rheumatology, and orthopedics—that had been undertaken because of Gregory's history of vertigo and continued symptoms that included concentration-precluding pain. (Id. at 27-43, R. 599-615). He was noted to have been homeschooled since February 2009, after having been an active teenager and baseball player, but had since gained 30 pounds because of inactivity. (Id.). His numerous diagnoses included autonomic nervous system dysfunction without orthostatic hypotension, hypersensitivity syndrome, obesity, and chronic dysfunctional pain-type syndrome. (Id.).

Concerning Gregory's pain around the lumbar puncture location, one specialist commented that it was "interesting that he has such hypersensitivity over the skin of that area. This may indicate some neuropathic element or an element of pain amplification syndrome[3] . . . ." (Id. at 35, R. 607). After detailing numerous comorbidities, that consultant concluded:

> Finally, Gregory's biggest health threat at this point is obesity. He has a BMI of around 36 which is quite abnormal and is likely contributing to his back and knee pain. I think it is very unlikely that these symptoms are going to get better as long as his weight remains where it is at.

(Id. at 35-36, R. 607-08).

---

[3] Amplified musculoskeletal pain syndrome (AMPS) is a condition in which patients develop an abnormal pain sensitivity, where the nervous system registers and processes normal sensations from movement and environmental experience as pain signals. *Causes and Treatment for Pain Amplification Syndrome*, https://docs.chocchildrens.org/causes-and-treatment-for-pain-amplification-syndrome/ (last visited March 10, 2021).

A consulting pediatric rheumatologist stated with regard to Gregory's diagnosis of autonomic dysfunction, "I do think that this has resulted from either his potential initial injury of his knee or other unknown causes, however, [the condition has] persisted and [has] allowed . . . pain amplification type of features [to] develop such as his chronic daily headaches and also his allodynia." (Id. at 30, R. 602).

On August 6, 2009, Gregory's primary care physician, Dr. Thomas Devine, wrote a letter stating that his "constant and continuous" symptoms—including headaches, generalized weakness, and severe lower back pain—prevented "him from doing even small amounts of activity for any great lengths of time. Even being upright for more than a fraction of an hour exacerbates these symptoms." (Id. at 20, R. 592). Dr. Devine assessed that Gregory was not "able to sit through an entire school day let alone ambulate the halls from class to class successfully. I do think he could go to school on a reduced schedule, however." (Id.).

On April 22, 2010, a pediatric neurosurgeon, David M. Frim, M.D., described Gregory's ongoing complaints of lower back pain rated as a 9 out of 10, as well as MRI findings that had revealed a small syrinx without a Chiari malformation. (Dkt. 8-7 at 2, R. 215). The specialist's examination was normal except for increased sensation around L4-5 and marked tenderness around the lumbar spine. (Id. at 3, R. 216). The provider explained the possibility of surgical treatment of "the syrinx with decompression of the bone in spite of the absence of the Chiari. In cases like this usually the syrinx will collapse but there is no guarantee that his symptoms

will improve. We felt that probably he needs [a] regular pain physician to follow[-]up [with] his pain management." (Id.). "Regarding his lower back pain, we do not feel that he needs any surgical intervention. We prefer doing surgery as a last resource to treat symptoms." (Id.). Gregory was considered "stable with minimal signs and some major pain issues." (Id.). At a six-month follow-up visit on September 16, 2010, Dr. Frim expressed confusion about the etiology of Gregory's continued lower back pain and noted that updated imaging showed that the syrinx had not gotten larger. (Id. at 4, R. 217).

On April 28, 2011, Gregory's treating neurologist, Jerry W. Smartt, Jr., M.D., wrote a letter requesting appropriate accommodations from the college that Gregory was enrolled in. (Dkt. 8-17 at 19, R. 591). Dr. Smartt explained that Gregory had a chronic neurological condition complicated by "exacerbations of pain that are incapacitating. He is unable to sit, stand, walk, or function effectively during these exacerbations and thus has been forced to miss time from class and unable to complete [schoolwork] at home." (Id.).

On August 22, 2011, MRIs were taken of Gregory's spine, with one showing "[a]bnormal appearance of the bony thoracic spine reflecting Scheuermann's kyphosis involving the mid and lower thoracic spine from T7 to T10," a "[s]mall to moderate left paracentral/lateral disc herniation at T7-8 resulting in mild left-sided ventral cord compression," a "[l]arge left-sided radial annular tear associated with a small left-sided disc protrusion at T8-9 without cord compression," and "[e]pidural lipomatosis of the thoracic spine." (Dkt. 8-16 at 34-35, R. 568-69). Another image

showed a "[s]mall cervical spinal cord syrinx at C6-7 without significant spinal cord expansion. No evidence of tumor or Chiari-I malformation," "[m]ild disc degeneration at C5-6, C6-7 and C7-Tl," "with small disc herniations at C6-7 and C7-Tl," and "[n]o spinal cord compression identified." (Id. at 39, R. 573).

On November 5, 2012, a physician that evaluated Gregory in a pain clinic described his ongoing pain and attempts at finding relief:

> Pain with continued pain [sic] at site of [lumbar puncture] since then. Pain does not radiate. Normally pain 6.5-7, today 9.5. Resting makes it better. Percocet helps. Movement makes it worse. Flexeril didn't work, T[ENS] unit didn't work, physical therapy didn't work, heat/cold pack, [T]oradol did not help, prednisone didn't help. Lyri[c]a, gabapentin didn't help. Pain is constant. Cymbalta does help.

(Dkt. 8-17 at 14, R. 586).

On September 11, 2014, an MRI was taken of Gregory's cervical and thoracic spine and the findings included "[m]ultilevel thoracic disc displacements [at] T1-2, T6-7 through T8-9, and T11-12 resulting in abutment and flattening of the cord [at] T6-7, [and] T7-8. Superiorly migrating left paracentral extrusions T11-12 abuts and flattens the left paracentral cord," "cord signal is abnormal and demonstrates syrinx formation" at C6-7, "[p]rominent posterior epidural fat pad [visible at] T1 through T11," and "[w]hen comparison [was] made with previous images dated 9/10/12, the findings at T6-7 are new. Remainder of the examination is similar." (Dkt. 8-8 at 60-61, R. 291-92).

Gregory continued regular treatment with Dr. Smartt. On May 14, 2015, Dr. Smartt noted that Gregory's lower back pain—found to be related to diagnoses of lumbar facet arthropathy, a cervical syrinx at C6-7, and thoracic right-sided disc

disease at T6-7—was "stable." (Dkt. 8-8 at 54, R. 285). He was advised to continue Percocet, Cymbalta, Tizanidine, use of a TENS unit, and attempted weight loss. (Id.). On February 9, 2016, Dr. Smartt also listed diagnoses of chronic pain syndrome and hypersensitivity disorder, as well as reports of increased pain with sitting after 30-45 minutes, standing 50-60 minutes, walking 20 minutes, and some flares with increased activity, illness, or sneezing. (Dkt. 8-9 at 40, R. 332). Dr. Smartt recommended continued pain medication, diet modification, and exercise/walking "as tolerated." (Id.). On June 17, 2016, Gregory reported increased pain over the last couple of weeks rated at 8 or 9 out of 10, with no known trauma, and no radicular pain in his arms and legs. (Id. at 11, R. 303). Dr. Smartt also recommended chiropractic treatment but advised Gregory to avoid manipulation of his neck. (Id.). Dr. Smartt noted that use of a TENS unit hadn't provided Gregory relief, physical therapy increased his pain, and he had a history of hypersensitivity to lumbar steroid injections. (Id.).

Gregory also regularly visited a rheumatologist, Steven H. Neucks, M.D., for treatment of lower back pain beginning on July 28, 2015. (Dkt. 8-8 at 46, R. 277). On April 21, 2016, Gregory reported pain, rated 7 out of 10, that was exacerbated by "activity in general" and relieved by "lying down" and "medications." (Id. at 40, R. 271). His height was measured at 6 feet and 1 inch tall, with a weight of 316 lbs., and his BMI was 41.69. (Id. at 41, R. 272). After the initial assessment, Dr. Neucks described, in part, the potential etiology of Gregory's pain and his relevant history:

> Evaluation has shown a number of other comorbid items including
> significant degenerative disc disease of a [widespread] nature of

cervical and lumbar as well as a syrinx. Serial MRIs of syrinx have not showed any substantial change. He was previously followed by Dr. [Frim at] University of Chicago from neurosurgery who felt that the syrinx was not the cause of his pain. He was seen by a pain physician in Dr. [Frim's] office who did wonder if a ketamine infusion might be helpful.

(Id. at 57, R. 288). Dr. Neucks's examinations findings were normal, except:

Thoracic and lumbar spines are well aligned and the area of somewhat poor demarcation around L2 of a proximally rectangular shape does seem to be the area of pain. He denies that it is radicular. Movement in this area does not appear to be restricted. Light touch or feather light touch did not seem to bother him, but local pressure sufficient for noting trigger points did seem to bother him.

(Id. at 58, R. 289). Dr. Neucks's impressions included:

1. Atypical lumbar spine pain follow[ing] the spinal tap with some suggestion of local cutaneous involvement by history and exam.
2. Failure by history of several attempts to control him with adjunctive medications including Neurontin, Lyrica, and Savella. When questioned about Lamictal, they thought he might have been on that. He is on 60 mg of Cymbalta and trials of raising the dose have not been successful. He has [had] two trials of topical medication and he is allergic to adhesive[s] and Lidoderm patch[es].
3. Use of class II medication he currently takes Percocet. There is no history or evidence of aberrancy. He is managed by Dr. Smartt.
. . .
5. Significant degenerative disc disease with [widespread] relatively mild mechanical problems of uncertain clinical symptoms.
6. Syrinx evaluated by pediatric neurosurgery and not felt to be operative nor [to] participate in his current symptoms.

(Id.). Dr. Neucks recommended continuing Percocet, and potentially trying Lamictal and a generic Lidoderm patch for pain. (Id.).

On December 8, 2015, another treating provider, Dr. David Patterson, listed Gregory's diagnoses as including syringomyelia. (Id. at 51, R. 282).

On July 23, 2016, Gregory attended a consultative examination at the request of the SSA. (Dkt. 8-11 at 35, R. 417). He reported constant pain around the location of the spinal puncture conducted more than six years earlier that resulted in an inability to walk more than 15 minutes, stand for more than 25 minutes, or sit for more than 30 minutes. (Id.). He was 72 inches tall and weighed 323 lbs. (Id.). The examination was normal except for "reactive tenderness to palpation of the upper spinous processes," forward flexion of the lumbar spine limited to 30 degrees, and lumbar extension was limited to zero degrees because of lower back pain. (Id. at 35-38, R. 417-20). The examiner's "medical source statement" was limited to listing diagnoses of "morbid obesity" and "chronic pain syndrome of [the] lower back." (Id. at 38, R. 420).

On August 15, 2016, Gregory reported to Dr. Smartt that he had "some worsening" of his pain, he did not lift anything heavier than a plate of food at home, he did not do any chores because of problems bending/twisting, he "could barely feed [his family's] dogs" without pain, he had not driven since age 17, he had increased pain with "sitting upright" for more than 30 to 45 minutes or standing for more than 15 to 20 minutes, and he needed to lay down for 30 minutes to help relieve pain after sitting or standing. (Id. at 60, R. 442). Dr. Smartt noted that Gregory had dropped out of school because of increased pain with sitting and walking necessary to attend class and that he also missed days because of his pain. (Id.). Dr. Smartt recommended no lifting of over 10 lbs. (Id.).

On January 6, 2017, Gregory reported to Dr. Smartt that he had "stable" pain rated, on average, as 8 out of 10 with the use of medications and exacerbated by "activity," "car rides," and "sitting upright in chairs." (Dkt. 8-16 at 16, R. 550). On March 2, 2017, Gregory reported that his pain and related sleep interruptions were worse over the last month, he had trouble sitting for 20 to 30 minutes before needing to move and change positions because of increased pain, and he had problems sitting with an "erect posture," as well as bending or twisting. (Id. at 4, R. 538). Dr. Smartt found thoracic and lumbar spasms to be present on examination. (Id. at 5, R. 539).

On April 18, 2017, Dr. Neucks recorded that Gregory weighed 332 lbs., with a BMI of 43.80, and he reported constant back pain that was non-radicular, increased with movement, and sometimes flared for a week at a time. (Dkt. 8-11 at 65, R. 447).

On May 26, 2017, an MRI of Gregory's cervical spine was taken—with comparison to a 2012 study—which showed "significant improvement" with the size of the cervical syrinx, but "extensive multilevel degenerative disc and facet changes much more prominent than would be expected for [the] patient's age," and "slightly worse than seen in [the] comparison study." (Dkt. 8-15 at 18-19, R. 526-27). He had foraminal narrowing at multiple levels including at C4-5 with "[p]rominent left uncovertebral hypertrophic spurring resulting in prominent left foraminal narrowing and likely left C5 impingement." (Id.).

On July 17, 2017, Dr. Smartt's examination notes recorded that Gregory had tenderness around his thoracic and lumbar spine. (Dkt. 8-15 at 2, R. 510). He was

14

observed to be sitting "cocked" to one side. (Id.). For Gregory's pain, Dr. Smartt prescribed Xartemis extended release rather than Percocet, until its production was stopped, and he replaced it with Oxycontin; he monitored appropriate usage by doing regular urine screens and requesting Indiana's Prescription Drug Monitoring Program (INSPECT) reports. (*See, e.g.*, Dkt. 8-10 at 2, R. 342 (INSPECT report); Id. at 9, R. 349 (urine screen panel); Dkt. 8-14 at 2, R. 490 (Gregory reported a slight increase in pain upon switching to Oxycontin); Id. at 9, R. 497 (drug testing results)).

On April 26, 2018, Dr. Smartt wrote a letter supporting Gregory's disability claim:

> Gregory . . . has been a patient under my care since June 24, 2010 for a chronic neurological condition. Greg has chronic pain syndrome due to chronic lumbar facet arthropathy, thoracic disc disease, syringomyelia and cervical disc disease. Over the past 7.5 years, we have attempted to treat and control Greg's condition with only modest success. Despite physical therapy, neurosurgical evaluation, multiple medication trials, Greg continues to have disabling pain. His pain greatly interferes with traditional activities of daily living. He has difficulty standing/walking greater than 15 min[utes]. He has difficulty sitting greater than 20 min[utes]. He has pain with bending, squatting, twisting, and lifting. He attempted to go to college but had to withdraw due to his condition causing him to miss classes and mobility issues in navigating the campus exacerbating his pain. Greg's condition is currently being treated with narcotic pain meds, muscle relaxers, and a neuropathic pain agent. He is not a surgical candidate. Prognosis is poor for improvement. Current limitations include: no lifting greater than 10 lbs[.], limit walking/standing to 15 min[utes] at a time before [he] need[s] to sit or lay [sic] down to relieve pain, [the need to] alternate positions after sitting for 20 min[utes]. He would not be able to sustain a 20[-]hour [workweek]. After treating Greg for the past 7.5 years, I feel that he is disabled.

(Dkt. 8-17 at 49, R. 621). Dr. Smartt also completed a physical residual functional capacity questionnaire, and supported his medical assessment by reference to diagnostic imaging of Gregory's spine. (Id. at 50, R. 622) Dr. Smartt noted he had treated Gregory every two months. (Id.). Dr. Smartt further highlighted his treatment notes explaining "clinical tenderness [and] tight muscles with spasms along" Gregory's entire spine. (Id.). Dr. Smartt assessed that Gregory would frequently have symptoms severe enough to interfere with attention and concentration necessary to complete even simple tasks during a typical workday, he could stand and walk for less than two hours in an eight-hour workday and sit for at least six hours, he would need to have the ability to change positions at will, he could only sit for 20 minutes or stand for 15 minutes at one time, he would need to take unscheduled breaks every 30 to 45 minutes for 10 to 15 minutes at time, and he would be likely to be absent more than four days per month. (Id. at 50-53, R. 622-25).

## B.  Factual Background

Gregory was 24 years old when he applied for SSI. (Dkt. 8-5 at 2, R. 147). He attended college and was enrolled in two classes but did not complete them or earn any credits. (Dkt. 8-2 at 36-37, R. 35-36). He has never worked. (Dkt. 8-6 at 7, R. 163).

## C.  ALJ Decision

In determining whether Gregory qualified for benefits under the Act, the ALJ employed the five-step sequential evaluation process set forth in 20 C.F.R. § 416.920(a) and concluded that Gregory was not disabled. (Dkt. 8-2 at 13-24, R. 12-

23). At Step One, the ALJ found that Gregory had not engaged in substantial gainful activity since the application date[4] of May 24, 2016. (Id. at 18, R. 17).

At Step Two, the ALJ found that Gregory suffered from "the following severe impairments: cervical, thoracic and lumbar degenerative disc disease, migraine/headaches and obesity." (Id.). The ALJ also found that asthma was a non-severe impairment. (Id.).

At Step Three, the ALJ found that Gregory's impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. § Pt. 404, Subpt. P, App. 1. (Id. (citing 20 C.F.R. §§ 416.920(d); 416.925; 416.926)).

After Step Three but before Step Four, the ALJ found that Gregory had the RFC to "perform sedentary work," with the following additional limitations:

- He can engage in no more than occasional stooping, and climbing of ramps and stairs;

- He cannot kneel, crouch, crawl, or climb ladders, ropes, or scaffolds;

- He should not have exposure to extreme heat, extreme cold, humidity, wetness, vibrations, or hazards, such as dangerous heights or machinery;

- He can sit for 30-45 minutes at a time for a total of up to 6 hours in the 8-hour workday, stand for 30-45 minutes at a time for a total of up to 2 hours in the 8-hour workday, and walk for 30-45 minutes at a time for a total of up to 2 hours in the 8-hour workday.

---

[4] SSI is not compensable before the application date. 20 C.F.R. § 416.335.

(Dkt. 8-2 at 19-20, R. 18-19).

At Step Four, the ALJ did not find any past relevant work to consider. (Id. at 23, R. 22).

At Step Five, relying on the vocational expert's testimony, the ALJ determined that, considering Gregory's age, education, work experience, and RFC, he was capable of adjusting to other work with jobs existing in significant numbers in the national economy in representative occupations such as a new account clerk, call operator, and information clerk. (Id. at 23-24, R. 22-23). The ALJ concluded that Gregory was not disabled. (Id. at 24, R. 23).

## IV.  ANALYSIS

Gregory challenges the ALJ's decision regarding the RFC assessment on two grounds. (Dkt. 12 at 15). First, Gregory contends that the ALJ improperly rejected the opinion of Dr. Smartt. (Id.). Second, Gregory asserts that the ALJ's credibility determination was patently wrong. (Id. at 21). The Court will consider these arguments in turn below.

### A. Whether the ALJ Improperly Rejected the Opinion of Dr. Smartt

First, Gregory argues that the ALJ "offered only perfunctory and unsupported rationale for dismissing the disabling opinion" of his treating neurologist, Dr. Smartt. (Id. at 15). He asserts that the ALJ provided no explanation for giving partial weight to Dr. Smartt's opinion regarding Gregory's functional limitations. (Id. at 16-17). Pointing to the ALJ's conclusion that Dr. Smartt's duration assessment and medical opinion were inconsistent with Dr.

Smartt's treatment plan, the Plaintiff argues that the ALJ has failed to identify any medical evidence that was inconsistent with either Dr. Smartt's clinical observations or Gregory's objective imaging. (Id. at 17). Moreover, the Plaintiff contends that the ALJ failed to consider the regulatory factors before discounting Dr. Smartt's treating source opinion. (Dkt. 17-18).

In response, the Commissioner argues that the ALJ's decision to give Dr. Smartt's opinion partial weight was proper because his medical opinion was inconsistent with Gregory's conservative treatment, his normal clinical signs, and his lack of radicular pain. (Id.). The Commissioner contends that the ALJ sufficiently detailed the relevant medical evidence, including the pain medications that were prescribed and the objective medical imaging, before addressing Dr. Smartt's opinion. (Id. at 5-6). As to the ALJ's consideration of the relevant regulatory factors, the Commissioner notes that "neither Dr. Smartt's specialty nor the frequency of his treatment undermine the ALJ's reasonable determination that substantial evidence in the record contradicted the more restrictive portions of his opinion." (Id. at 7). Regarding the imposed limitations in the RFC, the Commissioner argues that the ALJ's RFC assessment was consistent with Gregory's reports to Dr. Smartt that he could sit for only 30 to 45 minutes at a time. (Dkt. 18 at 5).

In reply, Gregory asserts that the vocational expert's testimony demonstrated that Gregory's ability to maintain exertional positions for a certain duration was material to the disposition of the case, but the ALJ did not offer any explanation as to why Dr. Smartt's relevant, disabling opinion was inconsistent with the record.

(Dkt. 19 at 1-2). Gregory further argues that the Commissioner points to the ALJ's citation of somewhat improved neck MRIs as "good reason" for departing from Dr. Smartt's opinion, but that neither the ALJ nor the Commissioner explain why the lumbar and thoracic MRIs that seem to support listing level disability (by showing cord and nerve root compromise) did not support Dr. Smartt's opinion. (Id.).

Under the "treating physician" rule, which applies to Gregory's claim, an ALJ should give controlling weight to the treating physician's opinion as long as it is supported by medical findings and consistent with substantial evidence in the record. *See* 20 C.F.R. § 416.1527(c)(2); *Gerstner v. Berryhill*, 879 F.3d 257, 261 (7th Cir. 2018) (noting that the treating physician rule applies only to claims filed before March 27, 2017). An ALJ is authorized, however, to reject a treating physician's opinion, so long as she offers "good reasons" for doing so. *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).

If an ALJ does not give a treating physician's opinion controlling weight, the ALJ is required to consider the length, nature, and extent of the treatment relationship; the frequency of examination; the physician's specialty; the types of tests performed; and the consistency and supportability of the physician's opinion. *Scott*, 647 F.3d at 740 (citing *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009)); 20 C.F.R. § 416.927(c). However, so long as the ALJ "minimally articulates" her reasoning for discounting a treating source opinion, the Court must uphold the determination. *See Elder v. Astrue,* 529 F.3d 408, 415-16 (7th Cir. 2008) (affirming

the denial of benefits where the ALJ discussed only two of the relevant regulatory factors).

Here, the ALJ explained:

Finally, I give partial weight to the opinions of the claimant's pain management physician, Dr. Smartt. His opinions are somewhat consistent with his treatment of the claimant, which showed conservative treatment, as well as predominantly within normal limits physical examinations and lack of radicular pain. [S]ome of his limitations were consistent with his treatment of the claimant and the entirety of the medical evidence in the record like lifting less than ten pounds. As such, I give partial weight to the opinions of Dr. Smartt.

(Dkt. 8-2 at 23, R. 22 (citations omitted)).

The SSA requires that the "RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." Social Security Ruling 96-8p (S.S.A. July 2, 1996), 1996 WL 374184, at *7. The Seventh Circuit has explained that "[a]n ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider 'all relevant evidence.'" *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) (citing *Clifford*, 227 F.3d at 871; *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)). "It is not enough for the ALJ to address mere portions of a doctor's report." *Myles*, 582 F.3d at 678 (citing *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000)). In this case, the ALJ did not confront the aspects of Dr. Smartt's opinion that are inconsistent with the ALJ's RFC finding.

Dr. Smartt assessed several limitations that are inconsistent with the ALJ's RFC finding, including that Gregory: (1) was limited to walking/standing for 15

minutes at a time before he needed to sit or lay down to relieve pain; (2) would need to alternate positions after sitting for 20 minutes, (Dkt. 8-17 at 49, R. 621); (3) could stand and walk for less than two hours in an eight-hour workday; (4) would need to take unscheduled breaks every 30 to 45 minutes for 10 to 15 minutes at time; and (5) would be likely to be absent more than four days per month. (Id. at 50-53, R. 622-25). The vocational expert's testimony established that at least four of those limitations would be work preclusive, leading to an immediate finding that Gregory is disabled. In the vocational expert's professional opinion, an individual must be able to maintain any exertional position (*i.e.,* standing, walking, or sitting) for at least 30 minutes to meet productivity standards, the individual must remain on task for 95 percent of the workday excluding scheduled breaks, and there is no tolerance in the competitive economy for an individual that needs to lie down or miss more than one day of work per month. (Dkt. 8-2 at 58-60, R. 57-59). At a minimum, the ALJ's failure to grapple with the disabling aspects of Dr. Smartt's opinion frustrates meaningful review.

The ALJ also did not demonstrate adherence to the regulatory framework to weigh medical opinions. The Seventh Circuit has explained that an "ALJ should explicitly consider the details of the treatment relationship and provide reasons for the weight given to [treating physicians'] opinions." *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014) (citing 20 C.F.R. § 404.1527(c)(2)). The ALJ noted that there was a treating relationship between Gregory and Dr. Smartt. However, the ALJ did not explicitly consider the long-standing duration of the relationship, nor did the ALJ

accurately note Dr. Smartt's specialty as a neurologist. The ALJ's failure to do so is legal error.

These errors of articulation, however, are not necessarily reversible errors. The Commissioner essentially argues that even if the ALJ had addressed Dr. Smartt's proposed disabling limitations and weighed the regulatory factors, the outcome would be the same. Harmless error can be used by a reviewing court to excuse an ALJ's error(s) with consideration of medical opinions. *See, e.g.*, *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011). Accordingly, the Court now considers whether the ALJ's errors were harmless in this case.

The regulatory framework instructs the ALJ to consider "consistency" with "the record as whole" when weighing a medical opinion. 20 C.F.R § 416.927(c)(4). The regulation also instructs the ALJ to consider the "supportability" of a medical opinion, which refers to the relevant evidence presented by the source to support the opinion, including "particularly medical signs and laboratory findings." 20 C.F.R. § 416.927(c)(3). However, the regulation specifies that the supportability factor is more relevant to weighing opinions from "non[-]examining sources." *Id.* Presumably, the relative distinction is appropriate because treating or examining sources' opinions can be compared for consistency with their corresponding treating notes or examination findings. *See Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010) (a treating source statement can be discounted if not properly explained and the treating notes do not provide any further clarification or support with objective signs).

23

The Commissioner argues that the ALJ's assignment of partial weight was consistent with Dr. Smartt noting that Gregory "reported pain with sitting after 30 to 45 minutes, which the ALJ accounted for by limiting Plaintiff to sitting for only 30 to 45 minutes at a time." (Dkt. 18 at 5 (citing Dkt. 8-11 at 60, R. 442)). However, that same treatment note also shows that Gregory reported that he had increased pain with "sitting upright" for more than 30 to 45 minutes, as well as standing for more than 15 to 20 minutes, and he needed to lay down for 30 minutes to help relieve pain after sitting or standing. (Dkt. 8-11 at 60, R. 442). The reported limitations with standing and the need to lie down would both be work preclusive, but neither were mentioned or addressed by the ALJ in her opinion. As such, the ALJ provided no reason, let alone a good reason, for her decision to only credit part of Dr. Smartt's treatment note as being "consistent" with her RFC assessment.

More generally, Dr. Smartt's opinion appears almost entirely consistent with Gregory's reported pain and related limitations. Dr. Smartt, for instance, was familiar with Gregory's inability to complete even two college courses because of his issues sitting in class, with traveling to campus, and with physical mobility. Gregory also reported missing school days and constantly complained of flares of intense pain that were physically incapacitating. In some instances, an ALJ may appropriately give reduced weight to a treating opinion that is based on the claimant's subjective reports. *See, e.g.*, *Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013). That is not the case here. Dr. Smartt's opinion is only partially based on

Gregory's subjective reports, but also rests on objective medical imaging and almost eight years of consistent treatment.

The Court concludes that the ALJ's errors are not harmless here. Dr. Smartt's opinion is consistent with and supported by the record, and the ALJ provided no explanation to the contrary. Additionally, the ALJ did not address Dr. Smartt's four additional proffered functional limitations that would be work preclusive and render Gregory disabled. The ALJ failed to provide a logical bridge between the evidence and her conclusions. Accordingly, further consideration of Dr. Smartt's opinion and Gregory's RFC is needed on remand.

## B. Whether the ALJ's Subjective Symptom Evaluation was Patently Wrong

Plaintiff next claims that the ALJ conducted an improper analysis of his subjective symptom allegations. (Dkt. 12 at 19-21). Plaintiff argues that the ALJ did not properly evaluate his symptoms as required by Social Security Ruling 16-3p. (Id.). "In evaluating a claimant's credibility, the ALJ must comply with SSR 16-3p and articulate the reasons for the credibility determination." *Karen A. R. v. Saul*, No. 1:18-cv-2024-DLP-SEB, 2019 WL 3369283, at *5 (S.D. Ind. July 26, 2019). SSR 16-3p describes a two-step process for evaluating a claimant's subjective symptoms.[5] First, the ALJ must determine whether the claimant has a medically determinable

---

[5] SSR 16-3p became effective on March 28, 2016, (S.S.A. Oct. 25, 2017), 2017 WL 5180304, at *13, replacing SSR 96-7p, and requires an ALJ to assess a claimant's subjective symptoms rather than assessing his "credibility." By eliminating the term "credibility," the SSA makes clear that the "subjective symptom evaluation is not an examination of an individual's character." *See* SSR 16-3p, 2016 WL 1119029 at *1. The Seventh Circuit has explained that the "change in wording is meant to clarify that administrative law judges are not in the business of impeaching a claimant's character." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016).

impairment that could reasonably be expected to produce the individual's alleged symptoms. SSR 16-3p, 2017 WL 5180304, at *3 (Oct. 25, 2017). Second, the ALJ must evaluate the intensity and persistence of a claimant's symptoms, such as pain, and determine the extent to which they limit his ability to perform work-related activities. *Id.* at *3-4.

A court will overturn an ALJ's evaluation of a claimant's subjective symptom allegations only if it is "patently wrong." *Burmester*, 920 F.3d at 510 (internal quotation marks and citation omitted). To satisfy this standard, the ALJ must justify her subjective symptom evaluation with "specific reasons supported by the record," *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013), and build an "accurate and logical bridge between the evidence and conclusion." *Villano,* 556 F.3d at 562. An ALJ's evaluation is "patently wrong" and subject to remand when the ALJ's finding lacks any explanation or support. *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014); *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

When assessing a claimant's subjective symptom allegations, the ALJ must consider "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." SSR 16-3p, at *4. Although the Court will defer to an ALJ's subjective symptom finding that is not patently wrong, the ALJ must still adequately explain her subjective symptom evaluation "by discussing specific reasons supported by the record."

*Pepper*, 712 F.3d at 367. Without this discussion, the Court is unable to determine whether the ALJ reached her decision in a rational manner, logically based on her specific findings and the evidence in the record. *Murphy*, 759 F.3d at 816 (internal quotations omitted); *see also* SSR 16-3p, at *9.

When assessing a claimant's subjective symptoms, ALJs are directed to "consider the consistency of the individuals own statements. To do so, [they] will compare statements an individual makes in connection with the individual's claim for disability benefits with any existing statements the individual made under other circumstances." SSR 16-3p (S.S.A. Oct. 25, 2017), 2017 WL 5180304, at *8. The ruling also explains that "[p]ersistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent." *Id*. at *9.

Here, both factors appear relevant and supportive. At one point, the ALJ acknowledged that Gregory "was consistent in reporting pain." (Dkt. 8-2 at 21, R. 20). Gregory also consistently reported relevant limitations with exertional abilities and performance of activities, as well as sought extensive treatment from multiple providers with frequent medication adjustments without reporting significant or sustained relief. Moreover, the relevant evidence spanned a considerable period that began well in advance of his claim for benefits. All of this tends to weigh in favor of crediting Gregory's allegations.

27

Nevertheless, the ALJ went on to conclude that Gregory's subjective symptom allegations were inconsistent with the record and additional functional limitations were not warranted because of Gregory's conservative treatment, examinations within normal limits, and lack of radicular pain. Gregory takes issue with two of the ALJ's stated reasons for discounting his subjective symptom complaints and suggested functional limitations: his conservative treatment and his lack of radicular pain. First, Gregory notes that his treating specialist, Dr. Smartt, specifically stated that he is not a surgical candidate. (Dkt. 8-17 at 49, R. 621). With surgery unavailable for his medical condition, Gregory's treatment could only consist of conservative treatment, yet the ALJ does not address this point. Instead the ALJ disregards Dr. Smartt's evaluation and concludes, without explanation, that Gregory's treatment plan is inconsistent with his subjective symptom complaints. The ALJ failed to provide a logical bridge between the evidence indicating that only conservative treatment was available and her conclusion that conservative treatment would be inconsistent with Gregory's alleged symptoms.

Gregory also takes issue with the ALJ's conclusion that his lack of radicular pain constitutes a good reason for discounting his subjective symptoms. There is no case or regulation, nor medical record or opinion in this case that the Court could locate that requires a claimant to have radicular pain in order to support his complaints of back pain. The ALJ provides no explanation for how Gregory's lack of radicular pain renders his symptom complaints inconsistent with the record. Without a medical opinion stating that Gregory's lack of radicular pain affects the

credibility of his symptom allegations, the ALJ impermissibly submitted her own medical judgment. As such, the ALJ conducted an improper credibility analysis.

The ALJ's credibility analysis will not be overturned so long as the ALJ gives specific reasons supported by the record. *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015). In this case, the ALJ's stated reasons for discrediting Gregory's subjective symptom allegations are not supported by the record. Therefore, the case is remanded on this issue as well, in order for the ALJ to conduct a proper credibility analysis.

## V.   CONCLUSION

For the reasons detailed herein, this Court **REVERSES** the ALJ's decision denying Plaintiff benefits and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C. § 405(g) (sentence four) as detailed above. Final judgment will issue accordingly.

So ORDERED.

Date: 3/11/2021

Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email.

29